676 So.2d 149 (1996)
STATE of Louisiana, DEPARTMENT OF SOCIAL SERVICES; DeGaulle Investments, LLC; and Claudia S. Haupt
v.
CITY OF NEW ORLEANS and Its Department of Safety and Permits.
DeGAULLE INVESTMENTS, LLC
v.
CITY OF NEW ORLEANS.
Nos. 95-CA-1757, 95-CA-1758.
Court of Appeal of Louisiana, Fourth Circuit.
May 29, 1996.
Rehearing Denied July 26, 1996.
*151 Charles P. Ciaccio, New Orleans, for Plaintiffs-Appellants DeGaulle Investments, LLC and Claudia S. Haupt.
Avis Marie Russell, City Attorney, Deborah L. Wilson, Chief Deputy City Attorney, Evelyn F. Pugh, Deputy City Attorney, New Orleans, for Defendants-Appellees The City of New Orleans and Its Department of Safety and Permits.
Before SCHOTT, C.J., and PLOTKIN and WALTZER, JJ.
WALTZER, Judge.
Plaintiffs-appellants, DeGaulle Investments, LLC (hereinafter "DGI) and its primary shareholder Claudia S. Haupt appeal from a May 22, 1995 judgment of the district trial court dismissing their petition. The trial court provided the following written reasons for judgment:
The decisions of the Board of Zoning Adjustments are afforded a presumption of validity. Gertler v. City of New Orleans, 346 So.2d 228 (La.App. 4th Cir.1977). The City Council here sat in a quasi-judicial capacity when it reviewed Degaulle Investments' application for a conditional use permit following the City Planning Commission's vote of 3-3 which resulted in a no action vote. Petitioners bear the burden of proving that the Council's action was arbitrary and capricious.
Once the conditional use process is reprised, the reviewing authority can look at the total impact of the development. In other words, since the building exceeded 10,000 square feet, its owner obtain (sic) was bound (sic) a conditional use permit to operate its business. Once kicked into the conditional use scenario, the building's use and its overall impact on the neighboring area can be considered.. (sic)
The zoning regulations promulgated for the Urban Corridor Overlay District contemplate an application for a conditional use permit before construction has begun. The regulations do not directly address the situation at hand in which the building seeking the conditional use permit is already in use and such permit is required because the buildings (sic) actual size exceeds that stated by the developer on its original application submitted to the Department of Safety and Permits before construction of the welfare office.
The Planning Commission vote had resulted in a tie, (sic) there was no recommendation sent up to the City Council. The City Council held a public hearing on the DeGaulle application on September 23, 1994. Because the building had been already constructed, the Council was faced with the difficult task of weighing the interests of the community against those of the state and the developer. It considered the pros and cons at a public hearing at which all interested parties were heard.

*152 I conclude that denial of the conditional use permit was not arbitrary and capricious.
Plaintiff-appellants raise four assignments of error, which are easily grouped as follows:
1. Whether the trial court erred in finding that the New Orleans City Council was not arbitrary and capricious in denying issuance of the conditional use permit?
2. Whether the terms of the zoning ordinance are arbitrary and capricious?
3. Whether the Council's denial of a conditional use permit was an unconstitutional deprivation of due process, a violation of equal protection, or an unlawful taking of property?

I. STATEMENT OF FACTS
On August 5, 1993 DGI signed a contract with the State indicating that the building would be a minimum of 11,672 square feet. On November 4, 1993, DGI applied for a permit with the City of New Orleans indicating that the building would be 9,615 square feet. Because Claudia S. Haupt is a principal in both DGI and in the construction company that built the building, it cannot be said that DGI was not aware of the differences. Because the permit and plans submitted indicated that the building was less than 10,000 square feet, no conditional use permit and no public hearing before the Council was required. After the building was built, it was revealed that the building was almost 13,000 square feet and that a conditional use permit and a public hearing should have been required. Much litigation ensued including several filings in this court which have not been published, namely 94-C-1097, 94-C-1139, and 94-CA-1346.
As a result of the litigation, DeGaulle Investments filed an application for a conditional use. The City Planning Commission voted 3 for and 3 against the conditional use application. In accordance with its regulations, the Commission did not recommend that the conditional use be granted or denied, but as a result of the deadlock returned a recommendation of no action. As required by the Comprehensive Zoning Ordinance of the City of New Orleans Art. 15 Sec. 1.5, the matter was forwarded to the City Council for further action after a public hearing. The hearing was held on September 23, 1994, and the Council voted to deny the conditional use permit. The Council's denial was appealed to the Civil District Court for the Parish of Orleans, which affirmed the action of the Council by its judgment of May 22, 1995 the reasons for which are quoted above. DGI appealed to this court.

II. STANDARD OF APPELLATE REVIEW
On appeal this court is bound by the following standards of review: A prima facie presumption of validity attaches to the acts of the Board. Buuck v. Board of Zoning Adjustments, 537 So.2d 244 (La.App. 4 Cir.1988). Even if the appellate court disagrees with a holding of the Board of Zoning Adjustments, the court is nevertheless obliged to sustain the Board's conclusion unless the evidence in its entirety so strongly preponderates against the Board's decision that it compels the Court to find an abuse of discretion on the part of the Board. Coliseum Square Ass'n v. Bd. of Zoning, 374 So.2d 177, 179 (La.App. 4 Cir.1979). In the absence of a clear abuse of discretion, the courts have no authority to substitute their conclusions for those of the Board. Coliseum Square, supra.

III. ARBITRARY & CAPRICIOUS

A. THE STATUTE AS APPLIED
DGI's building located at 2703 General DeGaulle Boulevard in Algiers was constructed within the DeGaulle Urban Corridor District. Zoning regulations for the DeGaulle Urban Corridor District are located at Article 5 Section 33 et seq. of the Comprehensive Zoning Ordinance of the City of New Orleans. Article 5 Sec. 33.1 states that one of the criteria is visual aesthetics of design. Art. 5 Sec. 33.6 discusses permitted conditional uses:
The purpose of the Conditional Use provisions is to provide for certain uses which because of their special characteristics require individual consideration under a site plan review procedure of the impact of *153 these uses ... Where allowed as a permitted use in the underlying zoning district, the following shall be conditional uses:
a. Cocktail lounges and bars.
b. Fast food and drive-in restaurants.
c. Any new development occupying more than 10,000 square feet of floor area or more than one acre of site area. [Emphasis added].
A conditional use permit is required to operate the building because it is almost 13,000 square feet[1]. At the public hearing held on September 23, 1994 before the New Orleans City Council, neighbors complained that the new structure did not comply with the design features of the DeGaulle Urban Corridor District.
The Comprehensive Zoning Ordinance contemplates that application for conditional use will be made before the non-conforming use begins. In the instant case, application was not made until after the non-conforming use was in operation. Unlike other non-conforming uses in the area which were remedied by additional conditions, the essence of the non-conforming use, square footage, is something that cannot be changed because the building is already built.
There is no requirement that the Council must grant a conditional use where the non-conforming use is something that cannot be changed; the decision is within the vast discretion of the Council. See: Buuck, supra.
In Buuck, supra, Mr. Buuck built three garages. He built the second and third garages without ever applying for any permits. He applied for permits when he built the first garage, but understated the size of the garage ultimately built on the permit. When challenged by the Department of Safety and Permits, Mr. Buuck applied for a zoning variance which was denied and Mr. Buuck was ordered to close his garages. Thus where the non-conforming use was something which could not be changed, this Court held that the Council properly denied the permit.
In the instant case, the City Planning Commission staff made several proposals which they suggested could help to camouflage the situation, such as installation of trees and a fence. The Council concluded, however, that these suggestions were insufficient in remedying the root problem, namely that the building is too big.
We find that the record supports the Council's decision not to grant a conditional use, and thus, the trial judge correctly found that the Council's decision was not arbitrary or capricious.

B. THE STATUTE AS WRITTEN
Just as there is a presumption in favor of the validity of the actions of the reviewing body, so there is a presumption in favor of the validity of the zoning ordinance as written and the burden of proving the contrary rests upon the party asserting its invalidity or nullity. Meyers v. City of Baton Rouge, 185 So.2d 278, 283 (La.App. 1 Cir. 1966). In the instant case, plaintiffs presented no evidence on the statute as written. The crux of their contention is the statute as applied. In any event, plaintiffs failed to carry their burden of proof to overcome the presumption. Our review of the statute as written, likewise, indicates no invalidity therein. This argument is without merit.

IV. DUE PROCESS, EQUAL PROTECTION AND UNLAWFUL TAKING
DGI argues that it has not been granted due process, or equal protection and that the Council's denial of the conditional use permit constitutes an unlawful taking. On the issue of due process, we note that DGI does not argue that it has not been accorded procedural due process and admitted itself at the Council hearing that it had engaged in all of the procedural steps, i.e. application, review by the Planning Commission staff, hearing before the City Planning Commission and hearing before the City Council. Rather DGI argues that the Council did not approach DGI's application with *154 an open mind. This argument is meritless. The Council listened to all parties, allowed everyone an opportunity to speak, and allowed DGI to file evidence into the record at the Council hearing. While the Council may not have been pleased with some of DGI's past actions, the Council gave DGI every opportunity to present its case. The due process argument is without merit.
DGI further argues that it was denied equal protection because conditional uses had been granted to the following applicants in the past:
1. Star Casino
2. Cypress Plaza Shopping Center on General DeGaulle
3. General DeGol, Inc.
4. L. Zuppardo Realty
5. Wagner & Truax, Co.
The Star Casino was not located in the DeGaulle Corridor, was a boat not a building, and dealt with levee issues not involved in the instant case. We find the Star Casino case inapplicable.
The Cypress Plaza Shopping Center permit dealt with a request to permit a phased renovation of a previously approved conditional use. In the instant case, there was no previously approved conditional use and it is not a renovation, but an original construction.
In all of the other cases, the buildings involved were less than 10,000 square feet and had problems which could be remedied.
In General DeGol, Inc. the building was 5,000 square feet. The Planning Commission was able to suggest parking plan changes which could be and were made. In the instant case, the parking plan is not the problem.
In L. Zuppardo Realty, the fast-food building was 1,942 square feet.
In Wagner & Truax Co., Inc. a vacant real estate office of approximately 2800 square feet was granted a conditional use to be renovated and used as a Veterinary Clinic.
DGI's equal protection claim is without merit.
Lastly, we address the issue raised of unlawful taking. A regulatory taking occurs when the regulation destroys a major portion of the property value. Annison v. Hoover, 517 So.2d 420 (La.App. 1 Cir.1988) writ denied 519 So.2d 148 (1988). An unconstitutional taking of private property does not result merely because the owner is unable to develop it to its maximum economic potential. Robertson v. Jefferson Parish, 465 So.2d 787, 791 (La.App. 5 Cir.1985) and the cases cited therein. A zoning action which deprives an owner of all practical use of his property without expropriation and compensation is unconstitutional. Robertson, supra. In the instant case, DGI's land and the parking lot thereon still have value and if the building is ordered demolished, DGI will be able to erect a new structure which either is granted a conditional use prior to construction or is less than 10,000 square feet. DGI could also attempt to renovate the building to remove the offending extra square footage. In any case, the zoning action does not deprive the owner of "all practical use" of its property.
For the reasons discussed, the judgment of the district court is affirmed.
AFFIRMED.
PLOTKIN, J., dissents.
PLOTKIN, Judge, dissenting.
Appellants seek a review of the denial of an application for a conditional use of a building at 2703 General DeGaulle as offices for the State of Louisiana, Department of Social Services. After hearings before the New Orleans City Planning Commission on July 26 and August 9, 1994, the Commission took no action other than to refer the matter to the New Orleans City Council. After a hearing before the City Council on September 23, 1994, the Council voted 7-0 to deny the application. Appellants sought review by the trial court, which upheld the action of the Council. The majority also upholds the action of the Council. Because I find the action of the Council to be arbitrary and capricious, I respectfully dissent.
On November 23, 1993, DeGaulle Investments, a limited liability company owned by *155 Claudia S. Haupt and her daughter Christine, applied for a building permit to construct an office building to be leased to the State for use as a welfare office. According to this application, the building would measure 9615 square feet. After construction was completed, an inspection made in response to citizen complaints revealed that the building measured 12,980 square feet. DeGaulle Investments was notified of the violation in May 1994. In response, DeGaulle Investments commenced litigation which is stayed pending resolution of this case.
The office building in dispute is located in a B-1 Neighborhood Commercial District which is subject to an Urban Corridor Overlay. The building conforms to the B-1 zoning district. The Urban Corridor Overlay permits an office building greater than 10,000 square feet only as a conditional use. Appellants contend the decision of the City Council to deny their request for a conditional use was improperly grounded on neighbors' opposition to the use of the property as a welfare office, the belief that the rent charged to the State was excessive, and alleged wrongful conduct in constructing a building in excess of 10,000 square feet in the region subject to the overlay. Appellants also contend that they were denied due process, equal protection, and subjected to an illegal taking. Appellees respond that the Council's decision was not arbitrary or capricious, appellants received adequate procedural safeguards such as notice and opportunity to be heard, and appellants have not been deprived of all practical use of the property.
A conditional use is a use authorized by a zoning ordinance when facts and conditions specified in the ordinance are found to exist. See Morton v. Jefferson Parish Council, 419 So.2d 431, 434 (La.1982). The standards governing the conditional use in dispute in this matter, which are a prerequisite to the valid exercise of quasi-judicial authority by the City Council in this case, are as follows:
a. Said use is necessary to promote the public interest at that location.
b. Said use is designed, located and proposed to be operated so that the public health, safety and welfare will be protected.
c. Said use will not cause substantial injury to other property in the neighborhood in which it is to be located.
d. Said use conforms to all district regulations of the applicable district in which it is to be located unless other provisions are specially set forth in the requirements governing specific conditional uses.
e. Said use conforms to any additional conditions which shall be deemed necessary by the City Council, upon the recommendation of the City Planning Commission, to secure the general objectives of this Ordinance so as to not adversely affect other properties in the neighborhood. Such additional conditions shall be established where applicable as necessary to provide:
(1) Adequate ingress and egress to property and proposed structures thereon with particular reference to vehicular and pedestrian safety and convenience, traffic flow and control, and access in case of fire.
(2) Off-street parking and loading areas where required, with particular attention to the items "a" above and the economic, noise or glare effects of the Conditional use on adjoining properties and properties generally in the district.
(3) Refuse and service area, with particular reference to the items in "a" and "b" above.
(4) Utilities with reference to location, availability, and compatibility.
(5) Screening and buffering with reference to type, dimensions and character.
(6) Control of signs, if any, and proposed exterior lighting with reference to glare, traffic safety, economic effect, and compatibility and harmony with properties in the district.
(7) Required yards and open space.
(8) For the general compatibility with adjacent or nearby land uses and zoning in the area.
Comprehensive Zoning Ordinance, Art. 15, § 2.6. Denial of a conditional use must be *156 based on the failure to meet the standards. Cf. Curran v. Board of Zoning Adjustments, 580 So.2d 417, 419-20 (La.App. 4th Cir.), writ denied, 584 So.2d 679 (La.1991); Lakeshore Property v. New Orleans, 481 So.2d 162, 167-68 (La.App. 4th Cir.1985), writ denied, 484 So.2d 674 (La.1986). Within these standards, the actions of the Commission and Council are presumed valid and will be reversed only if shown to be arbitrary and capricious. See Gertler v. New Orleans, 346 So.2d 228, 239 (La.App. 4th Cir.), writ denied, 349 So.2d 885 (La.1977), cert. denied, 434 U.S. 1068, 98 S.Ct. 1248, 55 L.Ed.2d 770 (1978). Denial in the absence of a showing that the standards are not met, however, is arbitrary. See Morton, supra, at 435. Moreover, community opposition alone is not a sufficient reason for denying a conditional use permit.
The City Commission's staff, in an August 10, 1994 report summarized the opposition to the conditional use:
Nearly all of the opponents cited the illegality of the building as their primary concern and objectionas one speaker noted, had the project followed the conditional use process from beginning, with its public hearings, the outcome might have been much different. Some further requested that the site be brought into compliance through demolition of the structure since approval "after the fact" would undermine the regulatory procedures. Other points included:
a. unattractive development which "devalues any building around it";
b. potential access and safety problems for people who might need to cross Gen. DeGaulle or walk along the adjacent vacant square (which has no sidewalks);
c. increased noise and activity;
d. violation of various setback, landscaping and other requirements (see attached letter from Mr. Caluda);
e. availability of other existing space at convenient locations and reasonable rates, thus negating the need for such construction exceeding the permitted size and violating other requirements of the Urban Corridor and zoning ordinance.
The Staff concluded:
One of the issues to be addressed is whether or not the usean officewould be compatible with surrounding development. In this regard, it must be recognized that the B-1 Neighborhood Business District permits offices without setting any maximum size: Offices are generally considered compatible uses along major urban corridors. Further, since the B-1 district is the most restrictive relative to retail and office uses, to the degree the development meets other setback and open space requirements, the use is generally considered compatible with the adjacent residential and business uses.
Neighborhood concerns included the additional noise and traffic. Staff feels that this development will have a negligible impact on the traffic along Gen. DeGaulle. Contrary to the uses on the adjacent block, during the day all business is conducted within the building, and the building will be closed in the evenings, further minimizing the impacts during the hours most people would be at home.
Another consideration is public safety and health. There is regular bus service along Gen. DeGaulle, with stops available within 1½ blocks (at the Park & Ride facility and across the street from it), although there is presently no bus stop on this block. It appears that many clients may use public transportation and some may walk to or from this office. Therefore, the safety of pedestrians crossing the highway to board or to exit the bus on that side is of some concern. In coordination with the Department of Streets, the applicant should provide crosswalk striping and caution signs and contribute to any additional traffic controls deemed necessary to assure pedestrian safety in crossing Gen. DeGaulle. The applicant should also work with the RTA to provide any needed improvements (benches and/or shelter, trash receptacles, etc.,) to the nearest bus stop or to a new stop in this block, as the RTA recommends.

*157 A related issue is the incomplete nature of the sidewalks along this side of Gen. DeGaulle. A new sidewalk has been installed along the frontage of the petitioned property but it does not extend the full length of the block. Since the nearest existing bus stops are 1-1½ blocks in that direction, the applicant should complete the sidewalk improvements the full length of the block.
As will be discussed below, the existing parking area extends across most of the adjacent parcel. Within the property boundaries of the subject parcel, there are 56 spaces. However, only 32 spaces are required. While the additional traffic generated by this use would have negligible impact on traffic along Gen. DeGaulle, the large expanse of parking over most of the square is unattractive and not in accord with the intent or requirements of the Overlay.
As noted below, the development does not appear to meet the required paving setbacks from the property line and the public rights-of-way; the right-of-way is not designated on the submitted plans but will be required to be shown on the final plans and all landscaping, etc. brought into compliance regarding setbacks.
Other issues of compatibility are primarily those of design and the degree to which the development does, or can be made to, respond to the Urban Corridor requirements.
. . . .
The subject site was recently constructed following review under the Urban Corridor requirements yet appears to have been built to a size exceeding that permitted without a conditional use review process. The impacts do not appear significant enough to warrant demolition; rather, they can be mitigated through improvements as recommended in the provisos. The one story office building is generally compatible with the surrounding uses and would otherwise be a permitted use within the B-1 Neighborhood Commercial District. The development does not meet the open space or landscaping requirements, but recommended provisos would bring it into conformance and also provide for such improvements as a bus stop.
The Staff recommended approval subject to the following eleven provisos:
1. The entire parking lot must be designed and treated as a whole; subsequent provisos therefore encompass that portion of the development.
2. The landscape plan must meet all urban corridor regulations and must indicate plant materials by botanical and common names as well as indicate plant sizes, location, and quantities.
3. The entire parking lot must indicate removal of existing paving to comply with the requirement of ten percent interior landscaping. This requirement could be met with the removal of parking spaces and the installation of landscaping allowing for the shade within the lot.
4. A continuous hedge or metal picket fencing with an opaque masonry base to a minimum height of thirty inches should be provided around the periphery of the site within the property line adjacent to any public right-of-way.
5. The trash dumpster must be screened from view with a six foot high opaque wooden fence with gates.
6. The applicant should provide a continuous six foot high opaque wood fence along the rear property line which fronts the residential development.
7. The building entry should be redesigned in keeping with the established symmetry of the structure to allow for an extended weather protection element and to clearly define the building's entrance as follows:
a. provision of a porte cochere;
b. change in building material;
c. relocation of the major entry (door);
d. relocation of the handicapped ramp.
8. The applicant may be permitted to have one detached sign and one attached building sign meeting the urban corridor regulations.

*158 9. In consultation with the RTA, the applicant shall provide improvements to the nearest bus stop or, pending the recommendations of the RTA, shall provide and help maintain a new bus stop on this block including such features as a bench and trash receptacle, at a minimum.
10. The applicant shall, in consultation with the Department of Streets and, where appropriate, the RTA, provide traffic control measures such as striping and warning signs or other necessary measures, to protect pedestrians crossing from the bus stop on the opposite side of Gen. DeGaulle.
11. The applicant shall extend the sidewalk along Gen. DeGaulle the full length of the block.
The City Commission, however, took no action in this matter because of a deadlocked 3-3 vote. In its reasons for non action, it stated the following:
1. The development was in blatant disregard of known requirements and should not be rewarded or allowed to set a precedent by receiving "after the fact" approval.
2. The building would be permitted by the underlying zone excepting for size; the additional square footage is not that much and the associated negative impacts can be mitigated; further, the other provisos would bring the development into compliance with UC regulation.
The City Council unanimously denied the application. A review of the video and transcript of this hearing clearly demonstrates the inadequacy of the proceeding before the Council. The arbitrary and capricious nature of the Council's decision is reflected in the comments made by council members.
The City Council appears to have made no effort to consider or apply the standards of Art. 15, § 2.6 of the Comprehensive Zoning Ordinance. Instead, for example, Councilwoman Peggy Wilson challenged the State's decision to rent the building as a welfare office:
Excuse me. I don't think he asked you a question, Mr. Aaron. So, I want to just... I have a question. If nobody else has a question, I have one question to ask the State. I have one of the most serious problems that I have with this whole thing is the crime that is being committed against the public by the extent of the lease, the annual cost of this lease. We have a Welfare Office, this is a Welfare Office that is supposed to benefit the poorest of the poor and the price that the State is paying is way beyond fair market value of any other property in that area and I want to know as the keeper of the public trust, how does the State justify paying that kind of a fee for a service which could be bought in an existing building for thousands of dollars cheaper than what it is that you are paying. Can you answer that?
. . . .
Why didn't you put it in the Fisher Housing Development right where the people are that it serves? Why don't you put it there or why don't you, do you have to put it in that location.
. . . .
I think we need to do something.
Councilman Troy Carter spoke in favor of deterring developers from future zoning violations, and only addressed the issue of impact in terms of neighbors' opportunity to voice opposition:
This argument is not about Welfare or the recipients. This argument is about the enforcement of the comprehensive zoning laws of this City and it is a shame and a sin to line up people and play on their fears and play on their emotions and then, hide behind them like feverous clods. It is criminal and it should be and it will be stopped, because the City cannot afford to just standby, sit by, and idly let violators do as they will and disregard the comprehensive zoning laws of this City.
. . . .
I can only speak to where we are now and that is that we are going to stand firm and enforce the rules and regulations that the people know them to be. They were published. There are public documents.

*159 If a regular citizen goes out and wants to build a garage and he does it improperly, he has made to tear it down and start over again. Then, why is it that we make special allowances for the "big boys" or the "big girls?" There should be no special allowances. The rules are made to be played and adhered to by everyone involved.
. . . .
This is an issue of right and wrong and following the comprehensive laws of this City. Because of the actions that have been taken, the neighborhood undoubtedly will be adversely effected, undoubtedly, because these people have not had an opportunity to have their input to be heard. That is what the conditional use process is about.
. . . .
Let's look deeper and let's realize that what is at stake here is the adherence, the strict adherence, of the comprehensive zoning laws of this City. In making sure that we don't open the floodgates to allow anyone who wants to come in, build a building and come back after the fact. If a drug dealer sells drugs and gives the proceeds to charity does that make it legal to sell drugs? I suggest not. He should still be imprisoned. Just because you sold drugs to get money to feed the hungry doesn't mean that your action was good. So, to build a building without proper permits, even though you are servicing a needed segment of our society, you are still in violation.
Councilwoman Ellen Hazeur also emphasized deterrence and neighborhood opposition:
You know, I think it is kind of an insult for the developers of this building to come here, today, and basically, what you told us was, "We managed to sneak through in the beginning, so ignore that and look at what we want to do now." That is an insult and as Councilman Carter said, "It is not going to work here, today."
. . . .
So, let this be a message that from now on there are changes in this City. We do care about the community and if you are smart, even if it is not in the requirements, you will contact the Council persons, so that if you do not know the residents in the neighborhood associations, you can find it out. So, let's let this be a message, because it needs to be heard and it will be enforced.
Councilman Jim Singleton concurred in the need for punitive and deterrent action:
So, they knew what the law was. They knew what the rules were, even beforehand and they still built a building with some 3,000 square feet or close to it, anyway, 2,000 plus over what they stated on the plans. To be that is just an outright lie or a flat out lie. If you say that you are going to do one thing and you do something else. Somebody lied in this case.
. . . .
And I think, a message to the people who did this. The message to any other developer who comes in is: you follow the law, follow the rules and you do not have any problem, but if you are going to deliberately break the law and do what you want to do, then, I think, you should get what you deserve and today, you will get my vote against the proposal.
From a review of the entire proceeding before the City Council, and of the proceedings before the City Commission, it appears that the conditional use permit was denied arbitrarily, solely on a visceral or political reaction rather than for reasons authorized by the Comprehensive Zoning Ordinance.
Absent an ordinance authorizing the consideration of prior violations of the zoning ordinance, the Commission and Council lack the authority to deny a conditional use permit solely because the building was already constructed in violation at the time of the application. Because the Council did not consider or apply the standards of the Comprehensive Zoning Ordinance, the trial judge erred in finding that the Council did not arbitrarily and capriciously deny the application for a conditional use. Because I would find that the Council acted arbitrarily and capriciously in this matter, I would not consider appellants' arguments concerning due process, equal protection, and illegal takings. Accordingly, I would reverse the denial of *160 the application and remand for a new hearing before the City Council in accordance with the standards of the Comprehensive Zoning Ordinance.
NOTES
[1] Karen Hilton of the City Planning Commission indicated that the building is 12,980 square feet. Barbara Fondis of the Algiers Council of Neighborhood Presidents indicated that the building was 12,735 square feet.